Jeffrey L. Mendelman (SBN 305629)
CASE LAW LTD.
580 California Street, 12th Floor
San Francisco, CA 94104
Phone: (833) 227-3583
Fax Number:  (415) 520-5405
Email: admin@caselawltd.com

Attorney for Plaintiff REFFIND LIMITED

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REFFIND LIMITED,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>LOYYAL CORPORATION, and DOES 1-50, inclusive,<br><br>　　　　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>(Breach of Contract – Diversity Action, 28 U.S.C. § 1332; U.S. CONST. art. III, § 2, cl. 1) |

## INTRODUCTION

1. This action arises out of Defendant Loyyal Corporation's admitted default on a convertible note in the amount of $800,000 plus unpaid interest and collection costs owed to Plaintiff Reffind Limited, an Australian corporation.

## JURISDICTION

2. This court has subject matter jurisdiction pursuant to 28 United States Code section 1332 and U.S. CONST. art. III, § 2, cl. 1.

3. The unlawful acts alleged herein occurred in San Francisco, San Francisco County, California, which is within this judicial district. Title 28 United States Code section 1391, subdivision (b) confers venue upon this Court.

## PARTIES

4. Plaintiff REFFIND LIMITED, is an Australian corporation.

5. Defendant LOYYAL CORPORATION is and at all times herein mentioned a corporate entity, duly organized and existing under the laws of the State of Delaware, with its principal place of business, or nerve center, in San Francisco, California.

6. Defendant employs Gregory Simon, as Chief Executive Officer, and DOES 1 through 50, in their official capacity are legally responsible and liable for the breach, injuries and damages hereinafter set forth. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission.

///

///

## STATEMENT OF FACTS

7. On or about January 24, 2018, Plaintiff and Defendant entered into a written agreement, to wit, an unsecured 2018 convertible promissory note ("promissory note"). (A true and correct copy of which is attached as Exhibit A and is incorporated by reference.)

8. Gregory Simon, Chief Executive Officer ("CEO") of Defendant bound Defendant by executing said promissory note through apparent, actual and/or inherent authority.

9. The promissory note was in the amount of $800,000 with Plaintiff identified therein as the Holder of the note and Defendant identified therein as the Company. Defendant promised to pay to Plaintiff the principal amount, $800,000, with simple interest on the outstanding principal amount at the rate of 2.5% per annum until the note is paid in full or converted into equity.

10. The maturity date for the promissory note was January 24, 2020.

11. The promissory note also provides for attorneys' fees and all reasonable costs and expenses incurred in connection with the collection of such amounts.

12. The promissory note has a "governing law" provision electing the State of Delaware, but no forum provision.

13. On March 10, 2020, Plaintiff, by and though Mr. Joshua Quinn, issued a properly noticed demand pursuant to the unsecured 2018 convertible promissory note for the principal and unpaid interest for a total of $842,520.55. (A true and correct copy is attached as Exhibit B and is incorporated by reference.)

14. Defendant failed to pay the demanded balance.

15. Through Mr. Simon, Defendant stated in no uncertain terms via e-mail on June 12, 2020, "You certainly have every right as a creditor of Loyyal to proceed with legal action to collect what is rightfully owed to you. I am sure everyone is in agreement on this."

16. Plaintiffs unsuccessfully attempted to mitigate damages, but then had to hire attorneys to enforce the promissory note and collect the outstanding amounts.

## DAMAGES

17. As a proximate result of Defendants' conduct, Plaintiff has suffered monetary damages in the amount of the principal plus unpaid interest on the promissory note as well as the costs incurred for collecting on the promissory note.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Breach of Contract, Diversity Action under 28 U.S.C. section 1332)**

(*Against Defendants* LOYYAL CORPORATION, *and DOES 1-50, inclusive*)

18. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 17 of this Complaint.

19. There was an offer of a contract by one party, an acceptance of that offer by the other party, consideration for the offer and acceptance; and sufficiently specific terms that determine the obligations of each party.

20. In this case, Defendant breached a contract by failing to perform its obligations by the terms in the contract, namely, but without limitation, timely payment when demanded of the principal and unpaid interest on the unsecured 2018 promissory note.

21. Plaintiff has sustained damages as a result of Defendant's failure to perform including, without limitation, the principal amount of the promissory note, the unpaid interest, and the costs incurred for collecting on the promissory note.

WHEREFORE, Plaintiff pray for relief as hereinafter set forth.

## PRAYER

WHEREFORE, Plaintiff pray for relief, as follows:

1. For the principal and unpaid interest on the unsecured 2018 convertible note in a sum to be proven at trial;
2. For reasonable costs and expenses incurred in connection with the collection of the principal and unpaid interest;
3. For reasonable attorney's fees;
4. For costs of suit herein incurred;
5. For declaratory and injunctive relief as the Court deems just and proper; and
6. For such other and further relief as the Court deems just and proper.

Dated: June 23, 2020.

Respectfully submitted,
CASE LAW LTD.

/s/ Jeffrey L. Mendelman
JEFFREY L. MENDELMAN
Attorney for Plaintiff

EXHIBIT A

THIS NOTE AND THE SECURITIES INTO WHICH IT MAY BE CONVERTED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

## Loyyal Corporation

### UNSECURED 2018 CONVERTIBLE PROMISSORY NOTE

**AMOUNT: $800,000**                                                              **DATE: January 24, 2018**

FOR VALUE RECEIVED, the undersigned, Loyyal Corporation, a Delaware corporation (the "*Company*"), promises to pay to the order of **REFFIND Limited** or its registered assigns (the "*Holder*"), the principal amount set forth, with simple interest on the outstanding principal amount at the rate of 2.5% per annum until this note is paid in full or converted into equity as provided for herein. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed.

Notwithstanding any other provision of this Note, the Holder hereof does not intend to charge and the Company shall not be required to pay any interest or other fees or charges in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder. All payments received by the Holder hereunder will be applied first to costs of collection, if any, then to the balance to principal.

Payments of principal and/or interest will be made by check in immediately available United States funds sent to the Holder at the address furnished to the Company for that purpose.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject and to which the Holder hereof, by the acceptance of this Note, agrees:

1. Maturity Date. Subject to the conversion provisions in Section 2 below, the unpaid interest and principal on this Note shall be due and payable upon the earlier to occur of (a) demand by the Holder at any time following January 24, 2020 (the "*Maturity Date*") or (b) upon demand by the Holder at any time following an Event of Default. The Maturity Date may be extended (the "*Extended Maturity Date*") by written election of the Holder. If the Maturity Date is extended as provided in the previous sentence, any references to the Maturity Date below shall be deemed to be amended to the Extended Maturity Date.

2. Note Conversion and Prepayment on Change of Control.

   2.1. Conversion Events and Prepayment on Change of Control.

      2.1.1 Automatic Conversion upon Equity Financing. If prior to the Maturity Date and prior to a Change of Control, the Company sells or issues equity securities (other than Common Stock) primarily for the purpose of raising capital in one or more transactions resulting in cumulative gross proceeds to the Company equal to at least Two Million Dollars ($2,000,000), not including for such purpose the outstanding

principal amount of the Note and accrued interest thereon (an "*Equity Financing*"), then, upon the date of the closing of such Equity Financing (the "*Closing Date*"), the then outstanding principal amount of this Note shall be automatically converted into such number of shares of the type of equity securities to be issued in the Equity Financing equal to the quotient obtained by dividing (a) the aggregate outstanding principal and unpaid accrued interest due on this Note on the day of conversion by (b) the applicable Conversion Price, rounded down to the nearest whole number of shares. The Note shall convert into the type of securities issued in the Equity Financing and on the same terms and conditions (other than the Conversion Price) as the other investors participating in the Equity Financing. For the avoidance of doubt, the anticipated Series A-3 Preferred Stock financing of the Company by REFFIND Limited and its affiliates in January and February of 2018 will not constitute an Equity Financing even if the proceeds would otherwise qualify as an Equity Financing.

For purposes of this Note, the term "*Conversion Price*" shall mean lesser of (i) the price per share as calculated based on an effective pre-money valuation of the Company of Sixteen Million, Five Hundred Thousand Dollars ($16,500,000) divided by the number of the Company's Fully Diluted Equity (as defined below) as of immediately prior to the initial closing of the Equity Financing, the Non-Qualified Equity Financing, or other conversion event, as the case may be, rounded down to the nearest whole cent (the "*Capped Conversion Price*") or (ii) the lowest per share price at which the equity securities are issued in the Equity Financing or Non-Qualified Equity Financing, as the case may be, multiplied by the Applicable Percentage (as defined below). For purposes of calculating the Conversion Price, the term "*Applicable Percentage*" shall mean eighty percent (80%) and the term "*Fully Diluted Equity*" shall mean the number of fully diluted shares of Common Stock of the Company outstanding (assuming conversion or exercise of all outstanding options, warrants and other convertible securities (other than the Note), and any shares reserved or authorized for issuance under the Company's existing equity incentive plans that have not been granted or issued).

2.1.2 <u>Optional Conversion upon a Non-Qualified Equity Financing.</u> If prior to the Maturity Date and prior to a Change of Control, the Company sells or issues equity securities (other than Common Stock) primarily for the purpose of raising capital in one or more transactions resulting in cumulative gross proceeds to the Company of less than Two Million Dollars ($2,000,000), not including for such purpose the outstanding principal amount of the Note and accrued interest thereon (a "*Non-Qualified Equity Financing*"), the Company shall provide the Holder with written notice thereof, and within 10 days of receipt of such notice, the Holder may by written notice elect to convert the then outstanding principal amount of the Note and all accrued interest thereon into such number of shares of the type of equity securities to be issued in such Non-Qualified Equity Financing equal to the quotient obtained by dividing (a) the aggregate outstanding principal and unpaid accrued interest due on the Note on the day of such conversion by (b) the applicable Conversion Price, rounded down to the nearest whole number of shares. The Note shall convert into the type of securities issued in the Non-Qualified Equity Financing and on the same terms and conditions (other than the Conversion Price) as the other investors participating in the Non-Qualified Equity Financing.

2.1.3 <u>Optional Conversion if No Conversion prior to Maturity Date.</u>  If this Note has not otherwise converted pursuant to Sections 2.1.1 or 2.1.2 prior to the Maturity Date, the Holder may elect to convert the then outstanding principal amount of the Note and all accrued interest thereon into such number of shares of the Company's Common Stock equal to the quotient obtained by dividing (a) the aggregate outstanding principal and unpaid accrued interest due on the Note on the day of such conversion by (b) the Capped Conversion Price, rounded down to the nearest whole number of shares, by delivering a written notice to the Company specifying the date on which such conversion is to occur.

2.1.4 <u>Conversion at Will.</u>  If this Note has not otherwise converted pursuant to Sections 2.1.1, 2.1.2 or 2.1.3, the Holder may elect to convert at any time the then outstanding principal amount of the Note and all accrued interest thereon into such number of shares of the Company's Common Stock equal to the quotient obtained by dividing (a) the aggregate outstanding principal and unpaid accrued interest due on the Note on the day of such conversion by (b) the Capped Conversion Price, rounded down to the nearest whole number of shares and adjusted such that the Fully Diluted Equity will be equal to the Fully Diluted Equity of the Company as of the date of this Note, by delivering a written notice to the Company at least 10 days before the date on which such conversion is to occur.

2.2 <u>Pre-Payment upon Change of Control</u>. Notwithstanding the foregoing, if a Change in Control (as defined below) occurs prior to the Maturity Date and prior to any conversion of this Note, then upon the consummation of such Change of Control, the Holder may elect at its sole discretion: (i) that the Company pay to the Holder, in addition to the unpaid interest and principal then outstanding under this Note, a "success payment" equal to 100% of the then outstanding principal amount and unpaid but accrued interest of such Holder's Note(s) or (ii) to convert the then outstanding principal amount of the Note and all accrued interest thereon into such number of shares of the Company's Common Stock equal to the quotient obtained by dividing (a) the aggregate outstanding principal and unpaid accrued interest due on the Note on the day of such conversion by (b) the Capped Conversion Price, rounded down to the nearest whole number of shares. The term "***Change of Control***" shall mean (i) the consummation of any transaction or series of related transactions to which the Company is a party in which ownership of in excess of 50% of the Company's outstanding voting power is transferred; (ii) the consummation of a merger, consolidation or other acquisition of the Company (other than a merger, consolidation or other acquisition the primary purpose of which is to change the jurisdiction of incorporation, create a holding company with ownership in approximately the same proportions, or raise equity financing), if after giving effect to such merger, consolidation or other acquisition of the Company, the stockholders of the Company immediately prior to such merger, consolidation or other acquisition do not represent a majority in interest of the holders of voting securities (on a fully diluted basis) with the ordinary voting power to elect directors of the surviving or resulting entity after such merger, consolidation or other acquisition; or (iii) the sale of all or substantially all of the assets of the Company to a third party who is not an affiliate of the Company.

2.3. <u>Conversion Procedure</u>.

2.3.1 <u>Notice of Automatic or Optional Conversion</u>. Upon the conversion of this Note pursuant to Section 2.1.1, written notice shall be delivered to the Holder of this Note at the

address shown on the records of the Company for the Holder or given by the Holder to the Company for the purpose of notice or, if no such address appears or is given, at the place where the principal executive office of the Company is located, notifying the Holder of the conversion to be effected, specifying the conversion price, the principal amount of the Note to be converted, the date on which such conversion has or will occur and calling upon such Holder to surrender to the Company, in the manner and at the place designated, the Note; provided, however, that such conversion shall be deemed to have occurred whether or not such Note is surrendered to the Company.

In the event the Holder desires to effect a conversion of the Note pursuant to Section 2.1.2, Section 2.1.3 or Section 2.1.4, then it shall give written notice (the "***Notice***") to the Company at its principal corporate office of the election to convert the same identifying whether it is an election to convert pursuant to Section 2.1.2, Section 2.1.3 or Section 2.1.4.  In the case of an election to convert pursuant to Section 2.1.2, the Note shall convert on the date of the Non-Qualifying Equity Financing or such later date as may be specified in the Notice and agreed to by the Company.  In the case of an election to convert pursuant to Section 2.1.3 or Section 2.1.4, the Note shall convert on the date specified in the Notice and agreed to by the Company.

2.3.2 <u>Certain Rights and Transaction Documents</u>. Upon the occurrence of the Equity Financing or a Non-Qualified Equity Financing in which this Note is converted pursuant to Section 2.1.2, the Holder shall be subject to the same terms and conditions as the other purchasers of equity securities in such Equity Financing or Non-Qualified Equity Financing, as the case may be, and the Holder agrees to execute a counterpart to the relevant transaction documents entered into among the Company and the purchasers of shares of equity securities in the Equity Financing or Non-Qualified Equity Financing, as the case may be. Upon the conversion of this Note pursuant to Section 2.1.3 or Section 2.1.4, the Holder agrees to execute an agreement with customary investor representations and warranties and transfer restrictions.

2.3.3 <u>Delivery of Stock Certificates</u>. As promptly as practicable after the conversion of this Note and delivery of this Note to the Company, the Company at its expense will issue and deliver to the Holder of this Note a certificate or certificates for the number of full shares of equity securities issuable upon such conversion. Such shares shall be registered under the name of REFFIND Limited, or under the name of any other affiliate of the Holder as instructed to the Company by the Holder from time to time.

2.3.4 <u>Mechanics and Effect of Conversion</u>. No fractional shares of the Company's capital stock shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Holder upon the conversion of this Note, the Company shall pay to the Holder the amount of outstanding principal and accrued interest that is not so converted, such payment to be in the form as provided below. The Company shall not be obligated to issue certificates evidencing the shares of the securities issuable upon conversion of this Note unless the Note is either delivered, duly endorsed, to the Company or its transfer agent, or the Holder notifies the Company or its transfer agent that the Note has been lost, stolen or destroyed and executes a customary lost note agreement whereby the Holder agrees to indemnify the Company from any loss incurred by it in connection with this Note. At its expense, the Company shall, as soon as practicable thereafter, issue and deliver to such Holder at such principal office a certificate or certificates for the number of shares of the Company's equity securities to which the Holder shall be entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon conversion of this Note, including

a check payable to the Holder for any cash amounts payable in lieu of fractional shares as described above. Upon conversion of this Note, the Company shall be forever released from all its obligations and liabilities under this Note.

3. <u>Events of Default</u>. The Holder may declare the entire unpaid principal on this Note to be immediately due and payable, by a notice in writing to the Company if any of the following events shall occur (each an "***Event of Default***").

(a) Default in the payment of principal or any accrued interest or other amount due under this Note on the date the same become due and payable; or

(b) The institution by the Company of proceedings to be adjudicated as bankrupt or insolvent, or the consent by the Company to institution of bankruptcy or insolvency proceedings against the Company under any federal or state law, or the consent by the Company to or acquiescence in the filing of any petition relating thereto, or the appointment of a receiver, liquidator, assignee, trustee or other similar official of the Company, or of any substantial part of its property, or the making by the Company of an assignment, for the benefit of creditors, or the admission by the Company in writing of its inability to pay its debts generally as such debts become due; or

(c) Commencement of proceedings against the Company seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within thirty (30) days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the equity holders of the Company of any trustee, receiver or liquidator of the Company or of all or any substantial portion of the properties of the Company which appointment shall not have been vacated within thirty (30) days thereof.

4. <u>Unsecured and Subordinated</u>. The indebtedness represented by this Note is unsecured and the Holder acknowledges and agrees that the obligation of the Company to make payment on this Note is expressly subordinated in right of payment to the prior payment in full of all of the Company's commercial finance lenders, insurance companies, lease financing institutions or other lending institutions regularly engaged in the business of lending money (the "***Senior Debt***"). The Note shall be pari passu in right of payment with all other promissory notes issued by the Company, other than the Senior Debt.

5. <u>Waiver of Notice; Fees</u>. The Company hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to a writing by the Holder, no failure to exercise any right of the Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof. If the Holder is required to commence legal proceedings or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Company shall be liable to pay or reimburse the Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including without limitation attorneys' fees.

6. <u>Transfer of this Note or Securities Issuable on Conversion Hereof</u>. With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, in addition to the requirements of Section 7.1.6 hereof, the Holder will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of such Holder's counsel to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, the Company, as promptly as practicable, shall notify such Holder that such Holder may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Act, unless in the opinion of counsel for the Company such legend is not required. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions.

7. <u>Representations</u>.

    7.1. <u>Representations of Holder</u>.

        7.1.1 This Note constitutes the Holder's valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

        7.1.2 Holder represents and warrants to the Company that Holder is acquiring this Note and the underlying securities for Holder's own account for investment only and not with a view to distribution or resale of the Note or underlying securities. The Holder represents that it is an "accredited investor" as such term is defined in Rule 501 under the Act. Holder understands that this Note and the underlying securities are being issued to Holder pursuant to an exemption from the registration requirements of the Act and, accordingly, must be held indefinitely by Holder unless later transferred in transactions that are either registered under the Act or exempt from registration. Holder

understands that the Company is under no obligation to register this Note or the underlying securities under the Act or to file for or comply with an exemption from registration, and recognizes that exemptions from registration, in any case, are limited and may not be available when Holder may wish to sell, transfer or otherwise dispose of the Note or the underlying securities.

7.1.3 Holder acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire this Note and the underlying securities. Such Holder further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering.

7.1.4 Holder represents and warrants to the Company that Holder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note and the underlying securities and that Holder is able to incur a complete loss of Holder's investment and to bear the risk of such a loss for an indefinite period of time. Holder understands that the Note and the underlying securities are a risky and speculative investment.

7.1.5 Holder understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. Holder represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

7.1.6 Without in any way limiting the representations set forth above, Holder further agrees not to make any disposition of all or any portion of this Note or the underlying securities unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 7 and:

(i) There is then in effect a Registration Statement under the Act covering such proposed disposition and such disposition is made in accordance with such Registration Statement; or

(i) Holder shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if requested by the Company, Holder shall have furnished the Company with an opinion of counsel, satisfactory to the Company, that such disposition will not require registration of such shares under the Act.

7.2. Company Representations. The Company represents that sufficient authorized but unissued shares of the Company's capital stock have been reserved or will be reserved by appropriate corporate action in connection with the prospective conversion of this Note. The issuance of this Note and the conversion of this Note are not in conflict with the Company's Articles of Incorporation or bylaws.

7.3. No "Bad Actor" Disqualification Events.  Neither (i) the Holder, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act of 1933, as amended (the "*Securities Act*")) held by the Holder is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except for disqualification events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed reasonably in advance of the issuance of this Note in writing in reasonable detail to the Company.

7.4 Legend. Any certificate representing shares of the Company's capital stock issued upon conversion of this Note shall be stamped or otherwise imprinted with a legend substantially in the following form in addition to any other legend as may be reasonably required by the Company:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

8. Miscellaneous.

8.1. Successors and Assigns. Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective executors, administrators, heirs, successors and assigns of the parties.

8.2. Loss or Mutilation of Note. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, in the case of loss, theft or destruction, or the surrender and cancellation of the Note, in the case of mutilation, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Principal is payable only to the registered Holder of the Note.

8.3. Titles and Subtitles. The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

8.4. Notices. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered personally or by electronic mail or by facsimile (receipt confirmed electronically) or shall be sent by a reputable express delivery service or by certified mail, postage prepaid with return receipt requested, addressed as follows:

if to the Company to:
Gregory Simon, CEO
_____

4839-5010-7994.v1

157940393 v6

_____

With a copy (which shall not constitute as notice) to:

_____

_____

_____

Attn:_____

if to the Holder to the Holder's address included on the signature page of this Note.

Either party hereto may change the above specified recipient or mailing address by notice to the other party given in the manner herein prescribed. All notices shall be deemed given on the day when actually delivered as provided above (if delivered by electronic mail, personally or by facsimile, provided that any such facsimile is received during regular business hours at the recipient's location) or on the day shown on the return receipt (if delivered by mail or delivery service).

8.5 <u>Note Holder Not Shareholder</u>. This Note does not confer upon Holder any right to vote or to consent to or to receive notice as a shareholder of the Company, as such, in respect of any matters whatsoever, or any other rights or liabilities as a shareholder, prior to the conversion hereof.

8.6 <u>Governing Law</u>. The terms of this Note shall be construed in accordance with the laws of the state of Delaware.

8.7 <u>Waiver and Amendment</u>. Any term of this Note may be amended, waived or modified with the written consent of the Company and Holder of this Note.

8.8 <u>Severability</u>. If any provision or set of provisions of this Note is held by an arbitrator or court of competent jurisdiction to be invalid, illegal or unenforceable for any reason, then (a) such provision shall be limited or modified in its application to the minimum extent necessary to avoid such invalidity, illegality or unenforceability; (b) the validity, legality and enforceability of the remaining provisions of this Note shall not in any way be affected thereby; and (c) to the fullest extent possible, the provisions of this Note shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

8.9 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Company has caused this Note to be signed in its name this 24th day of January, 2018.

**LOYYAL CORPORATION**

By: _____*Greg Simon*_____

Name: Gregory Simon

Title: Chief Executive Officer

ACCEPTED AND AGREED:

**REFFIND LIMITED**

By: _____

Name: Anthony Dunlop

Title: Director

By: _____

Name: David Jackson

Title: Director

IN WITNESS WHEREOF, the Company has caused this Note to be signed in its name this 24th day of January, 2018.

**LOYYAL CORPORATION**

By: _____

Name: Gregory Simon

Title: Chief Executive Officer

ACCEPTED AND AGREED:

**REFFIND LIMITED**

By: _____*[signed: Anthony Dunlop, DocuSigned, CA7FCBA48D5647D]*_____

Name: Anthony Dunlop

Title: Director

By: _____*[signed: DocuSigned, E233E03738394D1]*_____

Name: David Jackson

Title: Director

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT B



10 March 2020

Gregory Simon
Chief Executive Officer
Loyyal Corporation
By email: greg@loyyal.com
Cc:  the Board of Directors.

Dear Gregory,

**DEMAND PURSUANT TO UNSECURED 2018 CONVERTIBLE PROMISSORY NOTE**

We refer to the unsecured convertible note promissory note entered into between Loyyal Corporation (**Loyyal**) and Reffind Limited (**Company**) dated 24 January 2018 (**Note**).

Section 1 of the Note provides that subject to the conversion provisions set out in section 2, the unpaid interest and principal on the Note shall be due and payable upon the earlier to occur of:

(a)     a demand by the Company at any time following 24 January 2020; or

(b)     upon demand by the Company at any time following an event of default.

In accordance with section 1 of the Note, the Company wishes to advise Loyyal by way of demand that the unpaid interest and principal owing on the Note (being, a total of USD$842,520.55) is now immediately due and payable.

Accordingly, can you please arrange for payment of the unpaid interest and principal owing the Note to be made by Loyyal to the Company in immediately available funds to the following account:

Name: Reffind Limited
Bank: National Australia Bank
BSB: ▇6-492
Account Number: ▇▇▇▇0696

If immediate steps are not taken to make this payment, the Company will instruct its lawyers in the United States to commence legal proceedings against Loyyal.

Yours faithfully


**Joshua Quinn, Director,**

**For and on behalf of
Reffind Limited**

4938-01/2372127_1